FILED IN THE U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SEP 2 1 2023

SEAN F. McAVOY, CLERK
SPOKANE, WASHINGTON

Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Dan Fruchter
Tyler H.L. Tornabene
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TYLER KEITH ANDREWS,<br><br>Defendant. | 2:22-CR-00057-TOR<br><br>PLEA AGREEMENT<br><br>Fed. R. Crim. P. 11(c)(1)(C) |

Plaintiff, United States of America, by and through Vanessa R. Waldref, United States Attorney for the Eastern District of Washington and Dan Fruchter and Tyler H.L. Tornabene, Assistant United States Attorneys, and Defendant TYLER KEITH ANDREWS (hereinafter "Defendant") and Defendant's counsel, Katryna Spearman, agree to the following Plea Agreement:

1.  <u>Guilty Pleas and Maximum Statutory Penalties:</u>

Defendant, TYLER KEITH ANDREWS, agrees to plead guilty to Count 1 of the Superseding Indictment returned by the Grand Jury on January 18, 2023, charging Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. §§ 1349, 1343, a Class C felony.  Defendant understands that the following potential penalties apply:

(a)    not more than a 20-year term of imprisonment;

(b)    not more than a 3-year term of supervised release;

(c)     a fine not to exceed $250,000 or twice the pecuniary gain or twice the gross loss, whichever is greater;

(d)     restitution; and

(e)     a $100 special penalty assessment.

2.     <u>Supervised Release</u>

Defendant understands that if Defendant violates any condition of Defendant's supervised release, the Court may revoke Defendant's term of supervised release, and require Defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on post-release supervision, up to the following terms:

a.     5 years in prison if the offense that resulted in the term of Supervised Release is a class A felony,

b.     3 years in prison if the offense that resulted in the term of Supervised Release is a class B felony, and/or

c.     2 years in prison if the offense that resulted in the term of Supervised Release is a class C felony.

Accordingly, Defendant understands that if Defendant commits one or more violations of supervised release, Defendant could serve a total term of incarceration greater than the maximum sentence authorized by statute for Defendant's offense or offenses of conviction.

3.     <u>The Court is Not a Party to the Agreement:</u>

The Court is not a party to this Plea Agreement and may accept or reject it. Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will impose in this matter.

Defendant understands the following:

a.     sentencing is a matter solely within the discretion of the Court;

b.    the Court is under no obligation to accept any recommendations made by the United States or Defendant;

c.    the Court will obtain an independent report and sentencing recommendation from the United States Probation Office;

d.    the Court may exercise its discretion to impose any sentence it deems appropriate, up to the statutory maximum penalties;

e.    the Court is required to consider the applicable range set forth in the United States Sentencing Guidelines, but may depart upward or downward under certain circumstances; and

f.    the Court may reject the terms of the Fed. R. Crim. P. 11(c)(1)(C) plea agreement. However, if the Court rejects the terms of the plea agreement, Defendant or the United States may exercise the right to withdraw from the plea agreement as detailed herein.

4.    <u>Potential Immigration Consequences of Guilty Plea</u>

If Defendant is not a citizen of the United States, Defendant understands the following:

a.    pleading guilty in this case may have immigration consequences;

b.    a broad range of federal crimes may result in Defendant's removal from the United States, including the offense to which Defendant is pleading guilty;

c.    removal from the United States and other immigration consequences are the subject of separate proceedings; and

d.    no one, including Defendant's attorney or the Court, can predict with absolute certainty the effect of a federal conviction on Defendant's immigration status.

Defendant affirms that Defendant is knowingly, intelligently, and voluntarily pleading guilty as set forth in this Plea Agreement, regardless of any immigration consequences that Defendant's guilty plea may entail.

5.    <u>Waiver of Constitutional Rights:</u>

Defendant understands that by entering his pleas of guilty, Defendant is knowingly and voluntarily waiving certain constitutional rights, including:

    (a)    The right to a jury trial;

    (b)    The right to see, hear, and question the witnesses;

    (c)    The right to remain silent at trial;

    (d)    The right to testify at trial; and

    (e)    The right to compel witnesses to testify.

While Defendant is waiving certain constitutional rights, Defendant understands he retains the right to be assisted through the sentencing and any direct appeal of the conviction and sentence by an attorney, who will be appointed at no cost if Defendant cannot afford to hire an attorney. Defendant understands and agrees that any defense motions currently pending before the Court are mooted by this Plea Agreement, and Defendant expressly waives Defendant's right to bring any additional pretrial motions.

6.    <u>Elements of the Offense:</u>

The parties agree that, in order to convict Defendant of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1349, 1343, as charged in Count 1, the United States would have to prove beyond a reasonable doubt the following elements:

-    *First*, beginning no later than June 25, 2020, through on or about May 2, 2022, in the Eastern District of Washington and elsewhere, Defendant, TYLER KEITH ANDREWS, together with Co-Defendant YURIY PAVLOVICH ANISHCHENKO (ANISHCHENKO) and others, in some way and manner, agreed to try and accomplish a common and unlawful plan to commit wire fraud as charged in the Indictment; and

-    *Second*, Defendant TYLER KEITH ANDREWS knew the unlawful purpose of the plan and willfully joined the plan.

7.    <u>Factual Basis and Statement of Facts:</u>

The parties stipulate and agree that the United States could prove the following facts beyond a reasonable doubt at trial, and these facts constitute an adequate factual basis for Defendant's guilty pleas. This statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts which are relevant to the guideline computation or sentencing, unless otherwise prohibited in this agreement.

Beginning on a date unknown but no later than on or about June 25, 2020, and continuing to a date unknown but at least until on or about May 3, 2022, Defendant, together with co-defendant ANISHCHENKO and other known and unknown co-conspirators, engaged in a scheme and conspiracy to defraud the United States Small Business Administration (SBA), collectively obtaining millions of dollars in COVID-19 relief funding to which they were not entitled by making materially false and fraudulent representations, statements, and promises concerning their purported businesses.

Defendant, together with ANISHCHENKO and other known and unknown conspirators, collectively fraudulently obtained millions of dollars in COVID-19 relief funding that was intended and reserved for eligible and deserving small businesses during the midst of the COVID pandemic. Defendant, ANISHCHENKO, and their known and unknown conspirators, did this in a variety of ways, including:

      a. Defendant directing, assisting, and facilitating the submission of false and fraudulent loan applications for COVID-19 relief funding from his known and unknown co-conspirators, including ANISHCHENKO, and improperly and fraudulently obtaining a percentage of any resulting relief funding;

      b. ANISHCHENKO recruiting additional potential co-conspirators for both Defendant to direct, assist, and facilitate the submission of false and fraudulent loan applications for COVID-19 relief funding and to

improperly and fraudulently obtain a percentage of any resulting relief funding; and

   c. Defendant submitting false and fraudulent loan applications for COVID-19 relief funding for his own purported businesses.

The CARES Act

The Coronavirus Aid, Relief, and Economic Security Act ("CARES" Act) was a federal law enacted on March 27, 2020, designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

*The Economic Injury Disaster Loan Program*

One source of relief provided by the CARES Act was the Economic Injury Disaster Loan ("EIDL") program, an SBA program that provides low-interest funding to small businesses, renters, and homeowners affected by declared disasters. The CARES Act authorized SBA to provide EIDLs to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to advance up to $10,000 to a small business within three days of its application for an EIDL. The amount of the advance was determined by the number of employees claimed and certified by the small business. Those advances did not have to be repaid. In order to obtain an EIDL and advance, a qualifying small business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was the year preceding January 31, 2020. The applicant was also required to certify that all the information in the application is true and correct to the best of the applicant's knowledge.

The amount of an EIDL, if the application is approved, is determined based, in part, on the information provided in the application about employment, revenue, and

cost of goods sold, as set forth above.  Any funds issued under an EIDL or advance are issued directly by the SBA.  EIDL funds can be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtains a loan under the Paycheck Protection Program, the EIDL funds cannot be used for the same purpose as the Paycheck Protection Program funds.

As part of the EIDL loan authorization and agreement between the SBA and EIDL applicants, undisclosed fees or compensation to any representative (attorney, accountant, etc.) for services provided or to be provided in connection with applying for or closing the EIDL, are prohibited. In addition, even where a fee by an agent or representative, or any compensation thereto, is disclosed by an EIDL applicant and approved by SBA, such fee or compensation cannot be contingent on loan approval.

During the relevant time period, EIDL applications were received in cloud-based platforms.  The location of the server through which the EIDL application is submitted is based on the date the application was processed by SBA and the application number. During the relevant time period, EIDL applications were received in a Microsoft cloud-based platform through SBA servers located in Boydton, Virginia, West Des Moines, Iowa, or Quincy, Washington.

*The Paycheck Protection Program*

The CARES Act also created the Paycheck Protection Program ("PPP"), which authorized SBA, through delegated lenders, to provide forgivable loans to small businesses for job retention and other certain expenses.

In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the applicant (through its authorized representative) was required to state, among other things: (a) its average monthly payroll expenses; and (b) its number of employees. If the applicant had no employees

other than the owner, the applicant was required to provide the gross income amount from a 2019 or 2020 IRS Form 1040, Schedule C. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. Additionally, the application was required to certify that they were in operation as of February 15, 2020. The applicant was also required to certify that the information in the application was true and correct to the best of the applicant's knowledge.

A business's PPP loan application was received and processed, in the first instance, by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies. Data from the application, including information about the borrower, the total amount of the loan, the listed number of employees, and the gross income amount, was transmitted by the lender to the SBA, an agency of the United States, in the course of processing the loan.

During the relevant time period, PPP applications were received in cloud-based platforms. The location of the server through which the PPP application is submitted is based on the date the application was processed by the SBA and the application number. During the relevant time period, PPP applications were received through the Summit platform, a cloud-based platform utilizing the AWS GOV cloud servers located in Sterling, Virginia, and in Oregon. PPP lenders submitted disbursement details into the SBA E-Tran system in Sterling, Virginia.   E-Tran transmitted the PPP processing fee to the lender through the United States Treasury's Financial Management System (FMS) to the Treasury. The primary server for FMS is in Sterling, Virginia.

<u>The Defendants, Their Known and Unknown Co-Conspirators, and Others</u>

During the relevant time period, ANISHCHENKO was a resident of Spokane, Washington.  ANISHCHENKO represented that he owned and operated the businesses Sage Hollow Management and Grace Summers Enterprise, both purportedly located in Spokane, Washington.  With the direction, assistance, and facilitation of Defendant, ANISHCHENKO and Defendant fraudulently applied for and obtained CARES Act funding through the EIDL program on behalf of both businesses.

During the relevant time period, Defendant held himself out as the owner of Andrews Associates, Inc., a company purportedly located at times in the State of Colorado and the State of Arkansas, which purportedly provided credit recovery services as well as consulting services for businesses in obtaining CARES Act funding through the EIDL and other programs, including companies purportedly owned and operated by ANISHCHENKO, Sage Hollow Management and Grace Summers Enterprise, as well as other purported businesses purportedly owned and operated by Defendant and ANISHCHENKO's known and unknown conspirators, many of whom were referred to Defendant by and through ANISHCHENKO. Defendant further sought and obtained CARES Act funding through the EIDL program and PPP in the name of his own purported companies, including Andrews Associates, Inc., Andrews Associates, LLC, Texas Oil and Gas Express, Inc., Total Logistic Solutions Corp, TE Andrews Holdings, Total Benefit Solutions, and Andrews Corp, by submitting false and fraudulent loan applications, supporting documentation, and other information in support thereof.

Between at least on or about June 25, 2020, and May 2, 2022, in the Eastern District of Washington and elsewhere, Defendant, together with ANISHCHENKO and other co-conspirators, did knowingly combine, conspire, and agree to commit wire fraud. Defendant, ANISHCHENKO, and their co-conspirators knowingly devised and carried out a scheme and artifice to defraud the SBA, and to fraudulently obtain CARES Act funding through the EIDL program and PPP to which Defendant, ANISHCHENKO, and their co-conspirators were not entitled, by means of materially false and fraudulent statements, representations, and promises, concerning purported businesses through which Defendant, ANISHCHENKO, and their co-conspirators, applied for and received CARES Act funding, using signals and sounds transmitted by wire communication in interstate commerce to execute and attempt to execute the scheme and artifice to defraud. (hereinafter the Conspiracy). As part of the Conspiracy, Defendants, and their known and unknown co-conspirators, transmitted and caused to

be transmitted, by means of wire communication in interstate commerce, writings, signals, and sounds, to and from the Eastern District of Washington.

<u>WAYS, MANNER, AND MEANS OF THE CONSPIRACY</u>

It was part of the Conspiracy for Defendant to direct, assist, and facilitate the false and fraudulent EIDL applications of his co-conspirators, including ANISHCHENKO, and for Defendant, ANISHCHENKO, and their co-conspirators to share in the resulting fraudulently obtained loan proceeds.

It was further part of the Conspiracy that ANISHCHENKO would directly introduce new co-conspirators to Defendant for the purpose of establishing and perpetuating Defendant's direction, assistance, and facilitation of additional false and fraudulent EIDL applications and to share in the resulting fraudulently obtained loan proceeds.

It was further part of the Conspiracy that Defendant, ANISHCHENKO, and their co-conspirators would apply for EIDL and PPP Loans using materially false and fraudulent information regarding his own purported businesses.

*Written Agreements with Defendant*

It was part of the Conspiracy that co-conspirators, including ANISHCHENKO, would enter into written agreements with Defendant through his business Andrews Associates Inc. These written agreements provided that Defendant would assist (or, in some cases, had already assisted) the co-conspirator in securing EIDLs from the SBA in a specified amount, usually $150,000, in exchange for a specified fee, usually 10% or $15,000, to be paid within a specified time of receipt of the funding, by the co-conspirator to a specified bank account controlled by Defendant.

These written agreements between Defendant and his co-conspirators, including ANISHCHENKO, were not disclosed to the SBA in the resulting EIDL applications, were not approved by the SBA, and were contingent on loan approval. Consequently, all EIDL applications of Defendant and his co-conspirators, including ANISHCHENKO, subject to these written agreements, any such written agreement, and

any such unwritten agreement with Defendant, were false and fraudulent and would not have been approved by SBA had such agreements been properly disclosed as required by the EIDL loan authorization and agreement.

*ANISHCHENKO's False and Fraudulent Loan Applications*

ANISHCHENKO, with the assistance, direction, and facilitation of Defendant, applied for, and caused the application for, two EIDLs using false information about his purported company, Sage Hollow Management, and ANISHCHENKO's wife's purported company, Grace Summers Enterprise, in order to defraud, steal, and convert the proceeds of the EIDLs to ANISHCHENKO for his personal use and without any intent to use the proceeds thereof for any authorized purpose, and to provide a portion of the fraudulently obtained proceeds to Defendant, pursuant to the written agreement between Defendant and ANISHCHENKO.

Defendant directly assisted ANISHCHENKO with the submission of both false and fraudulent EIDL applications. For example, on or between June 25, 2020, and July 1, 2020, Defendant had multiple email communications through and using the interstate wires with ANISHCHENKO, in order to facilitate applying for and securing these two EIDLs by, for instance, providing the filled out false and fraudulent EIDL applications via "Docusign" for ANISHCHENKO to certify as true and accurate, which he did, despite the fact that the applications contained materially false and fraudulent information concerning Sage Hollow Management and Grace Summers Enterprise, neither of which was an active functioning business at the time of the applications.

Grace Summers Enterprise

On or about June 25, 2020, ANISHCHENKO, with the direct assistance of Defendant, applied for an EIDL by submitting application number 3306638649 to the SBA, under the name of ANISHCHENKO's wife's purported business, Grace Summers Enterprise of Spokane. ANISHCHENKO and Defendant's application falsely stated that Grace Summers Enterprise had 24 employees as of January 31, 2020, and that its gross revenues for the 12-month period prior to January 31, 2020 were $595,899.

ANISHCHENKO and Defendant did not disclose to SBA the fact of their agreement that ANISHCHENKO would pay Defendant a fee for assisting with the EIDL application and securing the EIDL funding.    On or about July 1, 2020, ANISHCHENKO falsely certified that the information in the application was true and correct to the best of his knowledge, under penalty of perjury and of other criminal penalties for false information. These representations and certifications were materially false and fraudulent.    In fact, Grace Summers Enterprise was not an active or functioning business as of January 31, 2020.  Grace Summers Enterprise did not have 24 employees nor the gross revenues claimed in the EIDL application.  Moreover, ANISHCHENKO had agreed to pay, and did ultimately pay, Defendant a fee for services provided in connection with applying for and closing the EIDL, which agreement was not disclosed to SBA. Accordingly, neither Grace Summers Enterprise nor ANISHCHENKO were eligible for any EIDL funding.  In EIDL application number 3306638649, ANISHCHENKO, provided for disbursement a business bank account associated with Grace Summers Enterprise held at Wells Fargo, account number X-9537.

As a result of the fraud and relying on the materially false and fraudulent representations and certifications made by ANISHCHENKO and Defendant, SBA approved the requested EIDL for Grace Summers Enterprise, and, on or about July 6, 2020, disbursed $149,900 through the interstate wires into the Wells Fargo business account ending in X-9537 located in the Eastern District of Washington.   On or about that same day, July 6, 2020, ANISHCHENKO transferred $14,970 through the interstate wire from the Wells Fargo business account ending X-9537 located in the Eastern District of Washington to Defendant via an Andrews Associates Inc., Wells Fargo business checking account located in the Western District of Arkansas.

Additionally, as a result of the fraud and relying on the materially false and fraudulent representations and certifications made by ANISHCHENKO and Defendant, SBA approved the requested EIDL advance for Grace Summers Enterprise, and, on or

about July 14, 2020, disbursed $10,000 to the Eastern District of Washington through the interstate wires into the Wells Fargo business account ending in X-9537.

Sage Hollow Management

On or about June 25, 2020, ANISHCHENKO applied for an EIDL by submitting application number 3306636455 to the SBA under the name of his purported business, Sage Hollow Management, with the direct assistance of Defendant. ANISHCHENKO identified Sage Hollow Management as a business located in Spokane, Washington, at the same address as Grace Summers Enterprises. Defendant and ANISHCHENKO falsely stated, in the application, that Sage Hollow Management had 23 employees as of January 31, 2020, and that its gross revenues for the 12-month period prior to January 31, 2020 were $595,321. ANISHCHENKO and Defendant also did not disclose to SBA the fact of their agreement that ANISHCHENKO would pay Defendant a fee for assisting with the EIDL application and securing the EIDL funding. On or about July 9, 2020, ANISHCHENKO falsely certified that the information in the application was true and correct to the best of his knowledge, under penalty of perjury and other criminal penalties for false information.

These representations and certifications were materially false and fraudulent. In fact, Sage Hollow Management was not a functioning business as of January 31, 2020. Sage Hollow Management did not have 23 employees nor the gross revenues claimed in the EIDL application and ANISHCHENKO had agreed to pay Defendant a fee for services provided in connection with applying for and closing the EIDL. Accordingly, neither Sage Hollow Management nor ANISHCHENKO were eligible for any EIDL funding. In EIDL application number 3306636455, ANISHCHENKO, provided for disbursement a personal bank account in his name held at Wells Fargo, account number X-7011.

As a result of the fraud and relying on the materially false and fraudulent representations and certifications made by Defendant and ANISHCHENKO, SBA approved the requested EIDL for Sage Hollow Management, and, on or about July 13,

2020, disbursed $149,900 through the interstate wires into the Wells Fargo personal account ending in X-7011 located in the Eastern District of Washington.

*ANISHCHENKO introduced co-conspirators to Defendant*

As part of the Conspiracy, ANISHCHENKO introduced additional co-conspirators into the Conspiracy by referring them to Defendant. so that additional false and fraudulent EIDL applications could be submitted by or in the name of the new co-conspirators and so that the Conspiracy could obtain and share in the resulting fraudulently obtained loan proceeds.

For example, and as part of the Conspiracy, on or between June 25, 2020 and June 26, 2020, ANISHCHENKO emailed Defendant detailed information for over a dozen "clients," which information included names, Social Security Numbers, dates of birth, bank account numbers, email addresses, telephone numbers, physical and mailing addresses as well as purported business information including  names of businesses, dates of creation, type of business, and business Tax ID Number.

As part of and in furtherance of the Conspiracy, ANISHCHENKO reached an agreement with Defendant whereby ANISHCHENKO would receive a fee for any fraudulently obtained CARES Act funding proceeds for any co-conspirator "clients" that he referred to Defendant TYLER KEITH ANDREWS.

*Defendant and ANISHCHENKO Direct, Assist, and Facilitate Known Co-Conspirator's False and Fraudulent EIDL Applications*

As part of the ways, manner, and means of the Conspiracy, Defendant and ANISHCHENKO assisted, directed, and facilitated co-conspirators, in the submission of false and fraudulent EIDL applications for the purpose of obtaining and sharing in any resulting fraudulently obtained loan proceeds.

By way of example, based upon ANISHCHENKO's introduction and referral, Defendant assisted, directed, and facilitated a co-conspirator, referred to herein as Co-Conspirator #1, in submitting at least one false and fraudulent EIDL application.  Co-Conspirator #1 entered into a written agreement with Defendant's purported business,

Andrews Associates, Inc. That agreement, signed by Defendant and dated July 4, 2020, called for Defendant, through his purported business, to "assist" Co-Conspirator #1 in securing an EIDL in the amount of $150,000 in exchange for Co-Conspirator #1 paying Defendant $15,000 "via wire transfer within 12 hours of receipt of the EIDL Loan proceeds from the SBA. . ." into Defendant's Wells Fargo business checking account for Andrews Associates, Inc.

On or about June 30, 2020, Co-Conspirator #1, with the direct assistance and facilitation of Defendant applied for an EIDL by submitting application number 3307663707 to the SBA, under the name of her/his purported business, referred to herein as Company A. Co-Conspirator #1 and Defendant, who prepared the application documents for Co-Conspirator #1, falsely stated in the application that Company A had gross revenues for the 12-month period prior to January 31, 2020 of $550,000. Co-Conspirator #1 and Defendant ANDREWS also did not disclose to SBA the fact of their agreement that Co-Conspirator #1 would pay Defendant a fee for assisting with the EIDL application and securing the EIDL funding.

On or about July 14, 2020, Co-Conspirator #1 and Defendant caused to be certified that the information in the application was true and correct to the best of Co-Conspirator #1's knowledge, under penalty of perjury and of other criminal penalties for false information.

These representations and certifications were materially false and fraudulent. In fact, Company A did not have the gross revenues claimed in the EIDL application. Moreover, Co-Conspirator #1 had agreed to pay, and did ultimately pay Defendant a fee for services provided in connection with applying for and closing the EIDL, which agreement was not disclosed to SBA. Accordingly, neither Company A nor Co-Conspirator #1 were eligible for any EIDL funding.

In EIDL application number 3307663707, Co-Conspirator #1 provided for disbursement an Umpqua bank account ending X-6922 located in the State of Washington. As a result of the fraud and relying on the materially false and fraudulent

representations and certifications made by Co-Conspirator #1 and Defendant, SBA approved the requested EIDL for Company A, and, on or about July 17, 2020, disbursed $150,000 via interstate wires into the Umpqua bank account ending in X-6922 located in the State of Washington.   On or about, July 21, 2020, Co-Conspirator #1 transferred $15,000 via interstate wire from the Umpqua account ending X-6922 located in the Western District of Washington to Defendant's Andrews Associates Inc., Wells Fargo business account located in the Western District of Arkansas.   Additionally, as a result of the fraud and relying on the materially false and fraudulent representations and certifications made by Co-Conspirator #1 and Defendant, SBA approved the requested EIDL advance for Company A, and, on or about July 7, 2020, disbursed $3,000 into the Umpqua bank account ending in X-6922, through the interstate wires.

By way of further example, Defendant and ANISHCHENKO assisted, directed, and facilitated a co-conspirator, referred to herein as Co-Conspirator #2, in submitting at least one false and fraudulent EIDL application.   On or about June 30, 2020, Co-Conspirator #2, with the assistance of the Defendant and ANISHCHENKO, applied for an EIDL by submitting application number 3307591890 to the SBA, under the name of her/his purported business, referred to herein as Company B.   On or about July 8, 2020, as part and in furtherance of the Conspiracy, Defendant emailed ANISHCHENKO a username and password for Co-Conspirator #2 to use when accessing the SBA's web-based portal for submitting EIDL applications and required information.   On or about July 9, 2020, as part of and in furtherance of the Conspiracy, ANISHCHENKO emailed the username and password for Co-Conspirator #2 provided by Defendant to Co-Conspirator #2.

On or about between August 4, 2020, and August 5, 2020, Co-Conspirator #2 emailed ANISHCHENKO regarding the difficulties Co-Conspirator #2 was having accessing the SBA's web-based portal using the username and password that Defendant ANISHCHENKO had provided.   After unsuccessfully attempting to assist Co-

Conspirator #2 to logon to the SBA's web-based portal, ANISHCHENKO provided Co-Conspirator #2 with a phone number for Defendant.

Co-Conspirator #2 and Defendant, who prepared the application documents for Co-Conspirator #2, falsely stated in the application that Company B's gross revenues for the 12-month period prior to January 31, 2020 were $597,435. Co-Conspirator #2 and Defendant also did not disclose to SBA the fact of their improper agreement that Co-Conspirator #2 would pay Defendant a fee for assisting with the EIDL application and securing the EIDL funding. On or about August 24, 2020, Co-Conspirator #2 falsely certified that the information in the application was true and correct to the best of his/her knowledge, under penalty of perjury and of other criminal penalties for false information.

These representations and certifications were materially false and fraudulent. In fact, Company B did not have the gross revenues claimed in the EIDL application. Moreover, Co-Conspirator #2 had agreed to pay, and did ultimately pay Defendant a fee for services provided in connection with applying for and closing the EIDL, which agreement was not disclosed to SBA. Accordingly, neither Company B nor Co-Conspirator #2 were eligible for any EIDL funding. In EIDL application number 3307591890, Co-Conspirator #2 provided for disbursement a business bank account with Bank of America ending X-9848. As a result of the fraud and relying on the materially false and fraudulent representations and certifications made by Co-Conspirator #2 and Defendant, SBA approved the requested EIDL for Company B, and, on or about August 24, 2020, disbursed $150,000 through the interstate wires into the Bank of America account ending X-9848 located in the Eastern District of Washington. In furtherance and as part of the Conspiracy, per the agreement between Co-Conspirator #2 and Defendant, Co-Conspirator #2 paid Defendant TYLER KEITH ANDREWS $15,000 for securing the EIDL funding.

Co-Conspirator #1 and Co-Conspirator #2 are simply examples of fraudulent EIDL applications prepared, submitted, caused to be submitted, and facilitated by

Defendant. In total, during the relevant time period, Defendant prepared dozens of false and fraudulent loan applications misrepresenting the number of employees, gross revenues, payroll, active status, and other material business information in order to fraudulently obtain EIDL funding as part of the Conspiracy. Many of these applications were for "clients" referred to Defendant by ANISHCHENKO. Many of these "clients" paid Defendant a fee once they had secured EIDL funding.

*Defendant's False and Fraudulent PPP and EIDL Applications for His Own Purported Businesses*

In addition, as part of the scheme and conspiracy, Defendant submitted, using interstate wires, numerous false and fraudulent PPP and EIDL applications on behalf of his own businesses, including Andrews Associates, Inc., Andrews Associates, LLC, Texas Oil and Gas Express, Inc., Total Logistic Solutions, and Andrews Corp., and numerous other businesses. In these false and fraudulent applications, Defendant misrepresented active status, payroll, number of employee, revenue, cost of goods sold, type of business, and other material information in order to fraudulently obtain EIDL and PPP funding. Additionally, in support of his applications, Defendant prepared and submitted, and caused to be prepared and submitted, false and fraudulent payroll and tax documentation submitted in support of the fraudulent applications to SBA and financial institutions.

In total, as part of the Conspiracy, Defendant fraudulently obtained at least $3,253,541 millions of dollars in PPP and EIDL funding for his own business that he owned and controlled, and further fraudulently obtained and assisted Co-Conspirators in obtaining at least $13,449,179 in EIDL funding for businesses of co-conspirator "clients", including ANISHCHENKO and dozens of additional co-conspirator "clients" referred to Defendant by ANISHCHENKO. Additionally, during the relevant time period and while participating in the fraudulent activity described above, Defendant's company TE Andrews Holdings, LLC obtained an additional $1,232,000 in SBA

funding through two other SBA loan programs, the CAPLine Program and the Preferred Lender Program.

8.    The United States Agrees:

(a)    To Dismiss Counts:

At the time of sentencing, the United States agrees to move to dismiss as to Defendant Counts 2 through 11 of the Superseding Indictment.

(b)    Not to File Additional Charges:

The United States Attorney's Office for the Eastern District of Washington agrees not to bring any additional charges against Defendant based upon information in its possession at the time of this Plea Agreement and arising out of Defendant's conduct involving illegal activity charged in the Indictment, unless Defendant breaches this Plea Agreement any time before sentencing.

9.    United States Sentencing Guideline Calculations:

Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "USSG") are applicable to this case and that the Court will determine Defendant's applicable sentencing guideline range at the time of sentencing.

(a)    Base Offense Level:

The parties agree and stipulate that Defendant's Base Offense Level is 7.  *See* USSG § 2B1.1(a).

(b)    Specific Offense Characteristics:

The parties agree and stipulate that Defendant's Base Offense Level is increased 20-levels for a loss greater than $9,500,000 but less than $25,000,000, pursuant to USSG § 2B1.1(b)(1)(K).

The parties have no agreement whether any other specific offense characteristics are applicable.  The United States and Defendant may argue for or against any adjustments and/or enhancements under the USSG noted in the Presentence Investigation Report.

(c)    <u>Aggravating Role:</u>

The Parties will recommend that Defendant's offense level be increased 4-levels on the basis that he was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  USSG §3B1.1(a).

(d)    <u>Acceptance of Responsibility:</u>

The United States will recommend that Defendant receive a three-level downward adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a-b), if Defendant does the following:

    i.    accepts this Plea Agreement;

    ii.    enters a guilty plea at the first Court hearing that takes place after the United States offers this Plea Agreement;

    iii.    demonstrates recognition and affirmative acceptance of Defendant's personal responsibility for Defendant's criminal conduct;

    iv.    provides complete and accurate information during the sentencing process; and

    v.    does not commit any obstructive conduct.

The United States and Defendant agree that at its option and on written notice to Defendant, the United States may elect not to recommend a reduction for acceptance of responsibility if, prior to the imposition of sentence, Defendant is charged with, or convicted of, any criminal offense, or if Defendant tests positive for any controlled substance.

(f)    <u>Criminal History:</u>

The parties make no agreement on Defendant's criminal history category, which shall be determined by the Court after the Presentence Investigative Report is completed.

10.    <u>Departure:</u>

The Defendant is free to move for a departure and/or variance under 18 U.S.C. § 3553.

11.    Incarceration:

The United States agrees to recommend a sentence at the low end of the sentencing guideline range ultimately determined by the Court at the time of sentencing. Defendant acknowledges that this Plea Agreement is entered pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) ("Rule 11(c)(1)(C)"). Pursuant to Rule 11(c)(1)(C), the United States and Defendant agree the appropriate disposition of the case is a sentence of incarceration not to exceed the high end of the sentencing guidelines range established by the Court at the time of sentencing, followed by a 3-year term of Supervised Release, and that Defendant may withdraw from this Plea Agreement if the Court imposes a term of imprisonment of greater than the high end of the sentencing guideline range determined by the Court, or indicates its intent to do so. Although the United States and Defendant enter this plea agreement pursuant to Rule 11(c)(1)(C), Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will ultimately impose.

The United States and Defendant acknowledge that the imposition of any fine, restitution, or conditions of Supervised Release are not part of the Rule 11(c)(1)(C) nature of this Plea Agreement; that the United States and Defendant are free to make any recommendations they deem appropriate as to the imposition of fines, restitution, or conditions of Supervised Release; and that the Court will exercise its discretion in this regard. The United States and Defendant acknowledge that the Court's decisions regarding the imposition of fines, restitution, or conditions of Supervised Release will not provide bases for Defendant to withdraw Defendant's guilty plea or withdraw from this Rule 11(c)(1)(C) Plea Agreement.

Defendant acknowledges that if the Defendant successfully withdraws from this Plea Agreement, the Plea Agreement becomes a nullity, and the United States is no longer bound by any representations within it.

12.    Criminal Fine:

The parties are free to make whatever recommendation concerning the imposition of a criminal fine that they believe is appropriate.

13.    Restitution:

The parties agree restitution is required pursuant to 18 U.S.C. §§ 3663(a), 3663A, and 3664. Further, pursuant to 18 U.S.C. § 3663(a)(3) and 3663A(a)(3), the Defendant voluntarily agrees to pay the agreed upon restitution amount in exchange for the United States not bringing additional potential charges, regardless of whether counts of the Indictment dealing with such losses will be dismissed as part of this Plea Agreement. With respect to restitution, the parties agree to the following:

(a)    Restitution Amount

The parties agree that the Court should order Defendant to pay restitution in the in an amount to be determined at or before sentencing. The parties agree that Defendant's restitution obligation of this amount shall be ordered jointly and severally with any other defendants who are subsequently sentenced in connection with the same or related scheme and conspiracy for which Defendant has pled guilty. *See* 18 U.S.C. § 3664(h).

(b)    Payments

The parties agree the Court will set a restitution payment schedule based on Defendant's financial circumstances. *See* 18 U.S.C. § 3664(f)(2), (3)(A). That being said, Defendant agrees to pay not less than 10% of his net monthly income toward his restitution obligation.

(b)    Treasury Offset Program and Collection

Defendant understands the Treasury Offset Program (TOP) collects delinquent debts owed to federal agencies. If applicable, the TOP may take part or all of Defendant's federal tax refund, federal retirement benefits, or other federal benefits and apply these monies to Defendant's restitution obligations. *See* 26 U.S.C. § 6402(d); 31 U.S.C. § 3720A; 31 U.S.C. § 3716.

Defendant also understands the United States may, notwithstanding the Court-imposed payment schedule, pursue other avenues to ensure the restitution obligation is satisfied, including, but not limited to, garnishment of available funds, wages, or assets. *See* 18 U.S.C. §§ 3572, 3613, and 3664(m). Nothing in this acknowledgment shall be construed to limit Defendant's ability to assert any specifically identified exemptions as provided by law, except as set forth in this Plea Agreement.

(c)    <u>Obligations, Authorizations, and Notifications</u>

The Defendant agrees to truthfully complete the Financial Disclosure Statement that will be provided by the earlier of 30 days from the Defendant's signature on this plea agreement or the date of the Defendant's entry of a guilty plea, sign it under penalty of perjury and provide it to both the United States Attorney's Office and the United States Probation Office.  The parties agree that Defendant's failure to timely and accurately complete and sign the Financial Disclosure Statement, and any update thereto, may, in addition to any other penalty or remedy, constitute Defendant's failure to accept responsibility under U.S.S.G §3E1.1.

The Defendant expressly authorizes the United States Attorney's Office to obtain a credit report on Defendant upon the signing of this Plea Agreement. Until the fine or restitution order is paid in full, Defendant agrees to provide waivers, consents or releases requested by the United States Attorney's Office to access records to verify the financial information.

The Defendant agrees to notify the Financial Litigation Unit of the United States Attorney's Office before Defendant transfers any interest in property with a value exceeding $1,000 owned directly or indirectly, individually or jointly, by Defendant, including any interest held or owned under any name, including trusts, partnerships and corporations. Further, pursuant to 18 U.S.C. § 3664(k), Defendant shall notify the court and the United States Attorney's Office within a reasonable period of time, but no later than 10 days, of any material change in Defendant's economic circumstances that might affect defendant's ability to pay restitution,

1   including, but not limited to, new or changed employment, increases in income,
2   inheritances, monetary gifts or any other acquisition of assets or money.

3       Until the fine or restitution order is paid in full, the Defendant agrees to disclose
4   all assets in which the Defendant has any interest or over which Defendant exercises
5   control, directly or indirectly, including those held by a spouse, nominee or third
6   party.

7       Pursuant to 18 U.S.C. § 3612(b)(F) the Defendant understands and agrees that
8   until a fine or restitution order is paid in full, the Defendant must notify the United
9   States Attorney's Office of any change in the mailing address or residence address
10  within 30 days of the change.

11      14.   <u>Forfeiture:</u>

12      The parties agree forfeiture applies.  *See* 18 U.S.C. § 981(a)(1)(C); 28 U.S.C.
13  § 2461(c). With respect to forfeiture, the parties agree to the following:

14      (a)   <u>Forfeitable Property</u>

15      The United States shall seek a forfeiture money judgment in this matter and will
16  not seek to forfeit specific property, except as set forth in this Plea Agreement or
17  authorized by law. The United States will not seek to forfeit proceeds in an amount
18  exceeding what Defendant actually obtained as a result of the crime. *See Honeycutt v.*
19  *U.S.*, 137 S. Ct. 1626 (2017).

20      (b)   <u>Money Judgment</u>

21      Defendant agrees to forfeit to the United States all right, title, and interest in the
22  following property: a money judgment in an amount to be determined at or before
23  sentencing, which represents the amount of proceeds Defendant obtained as a result of
24  his illegal conduct.

25      (c)   <u>Substitute Property</u>

26      Defendant understands the United States may seek for Defendant to forfeit
27  substitute property in satisfaction of the money judgment if the United States can
28  establish the following regarding the above-described property (*i.e.*, the money

judgment): a) it cannot be located upon the exercise of due diligence; b) it has been transferred or sold to, or deposited with, a third party; c) it has been placed beyond the Court's jurisdiction; d) it has substantially diminished in value; e) it has been commingled with other property and cannot be divided without difficulty. *See* 18 U.S.C. § 982(b)(1); 21 U.S.C. § 853(p). The United States will not seek to forfeit substitute property from other defendants or co-conspirators; it may only forfeit substitute property from Defendant. *See* 21 U.S.C. § 853(p).

(d)     Application of Forfeited Property to Restitution

Defendant understands the United States will seek restitution for the victim(s) in this case independent of this money judgment. It is the parties' mutual understanding that the United States Attorney's Office will seek approval to apply the proceeds of any forfeited assets to Defendant's restitution obligations. Defendant recognizes the final decision to approve this application rests with the Attorney General. *See* 18 U.S.C. § 981(d), (e); *see also* 28 C.F.R. 9 *et. seq.*

(e)     Cooperation on Forfeited Assets

Defendant agrees to cooperate with the United States in passing clear title on all forfeited assets. Defendant also agrees to assist the United States in locating any assets that 1) are the proceeds of illegal conduct (as outlined in this Plea Agreement) and 2) have not been dissipated. If such assets are located, then Defendant will stipulate to their forfeiture.

(f)     Waivers

Defendant agrees to waive oral pronouncement of forfeiture at the time of sentencing. *See* Fed. R. Crim. P. 32.2(b)(4)(B).

Defendant stipulates and agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with the Plea Agreement on any grounds, including a claim that forfeiture in this case constitutes an excessive fine or punishment.

Defendant stipulates and agrees to hold the United States, and its agents and employees, harmless from any and all claims whatsoever in connection with the investigation, the prosecution of charges, and the seizure and forfeiture of property covered by this Plea Agreement.

15.    <u>Supervised Release:</u>

The parties agree to recommend that the Court impose a 3-year term of supervised release. The parties are free to advocate for any special conditions they believe are appropriate.

16.    <u>Mandatory Special Penalty Assessment:</u>

Defendant agrees to pay the $100 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington. *See* 18 U.S.C. § 3013.

17.    <u>Payments While Incarcerated:</u>

If Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, then Defendant agrees to earn the money to pay toward these obligations by participating in Bureau of Prisons' Inmate Financial Responsibility Program.

18.    <u>Additional Violations of Law Can Void Plea Agreement:</u>

The parties agree that the United States may at its option and upon written notice to Defendant, withdraw from this Plea Agreement or modify its recommendation for sentence if, before sentencing, Defendant is charged or convicted of any criminal offense whatsoever or if Defendant tests positive for any controlled substance.

19.    <u>Waiver of Appeal</u>

In return for the concessions that the United States has made in this Plea Agreement, Defendant agrees to waive Defendant's right to appeal Defendant's conviction and sentence if the Court imposes a term of imprisonment consistent with the terms of this Rule 11(c)(1)(C) Plea Agreement.

If the Court indicates its intent to impose a sentence above the Rule 11(c)(1)(C) terms of this Agreement and Defendant chooses *not* to withdraw, then Defendant: (a) may appeal only Defendant's sentence, but not Defendant's conviction; (b) may appeal Defendant's sentence only if it exceeds the high end of the Guidelines range determined by the Court; and (c) may appeal only the substantive reasonableness of Defendant's sentence.

Defendant expressly waives Defendant's right to appeal any fine, term of supervised release, or restitution order imposed by the Court.

Defendant expressly waives the right to file any post-conviction motion attacking Defendant's conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based on ineffective assistance of counsel arising from information not now known by Defendant and which, in the exercise of due diligence, Defendant could not know by the time the Court imposes sentence.

Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack upon the conviction or sentence, including, but not limited to, writ of habeas corpus proceedings brought pursuant to 28 U.S.C. § 2255.

20.     Withdrawal or Vacatur of Defendant's Plea

Should Defendant successfully move to withdraw from this Plea Agreement or should Defendant's conviction be set aside, vacated, reversed, or dismissed under any circumstance, then:

    a.     this Plea Agreement shall become null and void;

    b.     the United States may prosecute Defendant on all available charges;

    c.     The United States may reinstate any counts that have been dismissed, have been superseded by the filing of another charging instrument, or were not charged because of this Plea Agreement; and

d. the United States may file any new charges that would otherwise
be barred by this Plea Agreement.

The decision to pursue any or all of these options is solely in the discretion of
the United States Attorney's Office.

Defendant agrees to waive any objections, motions, and/or defenses Defendant
might have to the United States' decisions to seek, reinstate, or reinitiate charges if a
count of conviction is withdrawn, set aside, vacated, reversed, or dismissed, including
any claim that the United States has violated Double Jeopardy.

Defendant agrees not to raise any objections based on the passage of time,
including but not limited to, alleged violations of any statutes of limitation or any
objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth
Amendment.

21. <u>Integration Clause:</u>

The parties acknowledge that this document constitutes the entire Plea
Agreement between the parties, and no other promises, agreements, or conditions exist
between the parties concerning this case's resolution. This Plea Agreement is binding
only upon the United States Attorney's Office for the Eastern District of Washington,
and cannot bind other federal, state, or local authorities. The parties agree that this
agreement cannot be modified except in writing that is signed by the United States and
Defendant.

<u>Approval and Signature</u>

Agreed and submitted on behalf of the United States Attorney's Office for the
Eastern District of Washington.

Vanessa R. Waldref
United States Attorney

_____          9/5/2023
Dan Fruchter                          Date
Assistant United States Attorney

Plea Agreement- 28 of 29

1

2    Tyler H.L. Tornabene               9/5/2023

3    Assistant United States Attorney        Date

4

5          I have read this Plea Agreement and have carefully reviewed and discussed

6    every part of the agreements with my attorney. I understand and voluntarily enter into

7    the Plea Agreement. Furthermore, I have consulted with my attorney about my rights,

8    I understand those rights, and I am satisfied with the representation of my attorney in

9    this case. No other promise or inducements have been made to me, other than those

10    contained in this Plea Agreement and no one has threatened or forced me in any way

11    to enter into this Plea Agreement. I am agreeing to plead guilty because I am guilty.

12

13    TYLER KEITH ANDREWS         8|23|23

14    Defendant                      Date

15          I have read the Plea Agreement and have discussed the contents of the

16    agreement with my client. The Plea Agreement accurately and completely sets forth

17    the entirety of the agreement between the parties. I concur in my client's decision to

18    plead guilty as set forth in the Plea Agreement. There is no legal reason why the

19    Court should not accept Defendant's plea of guilty.

20

21                          August 9, 2023

22    Katryna Spearman             Date

23    Murdoch Walker

24    Lowther Walker LLC

       Attorneys for Defendant

25

26

27                        ORIGINAL

28